## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| G SQUARED EQUITY, MANAGEMENT LP | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 1:25-cv-12036 |
| | ) | |
| v. | ) | |
| | ) | |
| CASSANDRA CAPITAL GMBH, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant Cassandra Capital GmbH ("Cassandra"), by and through its undersigned counsel, respectfully moves this Court pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6) to dismiss Plaintiff G Squared Equity Management LP's ("G Squared") Complaint in its entirety.[1]

Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
181 W. Madison, Suite 4700
Chicago, Illinois 60601
T: 312.899.6625
alex@loftusandeisenberg.com
*Counsel for Plaintiff*

---

[1] The controlling Seventh Circuit authority is *Lewellen v. Morley*, which holds that "the filing of an 'appearance form' does not relieve [the] plaintiff from executing proper service of process upon the defendants" and that there is "no federal rule that an appearance form is a valid substitute for service." 909 F.2d 1073 (7th Cir. 1990). District judges in this circuit follow the same rule. Judge Alonso rejected a waiver argument where the defendants had first filed appearances, then moved under Rules 12(b)(5) and 12(b)(6), explaining that "as long as defendants comply with the rules by raising their defenses in their first responsive pleading or consolidate their defenses in a pre-pleading motion under Fed. R. Civ. P. 12(b), they do not waive their Rule 12(b) defenses." *Reitz v. Creighton*, No. 1:15-cv-01854, 2015 WL 5081485, 2015 U.S. Dist. LEXIS 113431 (N.D. Ill. Aug. 26 , 2015). Judge Kennelly reached the same result two years later, noting that "actual knowledge of the existence of a lawsuit is insufficient to confer personal jurisdiction over a defendant in the absence of valid service of process" and that timely assertion of Rule 12(b)(5) preserves the defense despite earlier appearances. Petzel v. Kane Cnty. Dep't of Transp., No. 1:16-cv-05435, 2017 WL 283113, (N.D. Ill. Jul. 6 , 2017).
.

## I.   INTRODUCTION

This is a textbook case of forum shopping masquerading as declaratory relief. G Squared—a sophisticated Chicago-based venture capital firm with its principal office at 180 N. Stetson Avenue, Suite 5100, Chicago, Illinois—raced to federal court on October 1, 2025 to file a purely declaratory action seeking a pronouncement that it owes nothing under a contract it drafted, negotiated from Chicago, and executed through its Chicago managing partner. Yet G Squared never bothered to serve this Complaint. Instead, it sat on the filing for nearly a week while Cassandra prepared and filed a comprehensive breach of contract action in the Circuit Court of Cook County, Illinois—the very forum whose law governs the parties' agreement and where G Squared maintains its headquarters.

Now that Cassandra has filed suit in the proper forum seeking actual relief (damages of $950,000 plus interest), G Squared asks this Court to preemptively declare the rights of the parties in a duplicative federal action that serves no purpose other than to gain a perceived litigation advantage. This is precisely the scenario the Supreme Court condemned in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), and *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942).

Moreover, this Court lacks personal jurisdiction over Cassandra under Rule 12(b)(2). Cassandra is a German entity with no U.S. presence whose only Illinois contacts are a contractual relationship with an Illinois plaintiff and incidental communications—contacts that the Seventh Circuit has repeatedly held insufficient to establish purposeful availment.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

G Squared is a Delaware limited partnership with its principal office in Chicago, Illinois, specializing in growth-stage technology investments. (Fed. Compl. ¶¶ 5, 10). Cassandra Capital

GmbH is a German limited liability company with its principal place of business in Berlin, Germany, led by Christian O. Edler, a venture capital investor who operates from Berlin and sources European investment opportunities. (Fed. Compl. ¶ 6; Cook County Compl. ¶¶ 4, 6-8, attached hereto as Exhibit "A").

On September 23, 2021, the parties entered into a Referral Fee Agreement pursuant to which Cassandra would introduce investment opportunities to G Squared in exchange for transaction fees. (Fed. Compl. ¶ 12; Cook County Compl. ¶ 16). The Agreement was drafted by G Squared's Chicago-based legal team, approved by Chicago management, and executed by Larry Aschebrook from G Squared's Chicago office. (Cook County Compl. ¶ 17). The Agreement identified two "Targets": Gorillas Technologies GmbH and Choco Communications GmbH (both German companies), and provided for fees of 2% on committed capital up to $20 million and 1% above $20 million. (Fed. Compl. Ex. 1 at Ex. A, Ex. B). Section 11 provides that the Agreement "shall be governed by the laws of the State of Illinois." (Fed. Compl. Ex. 1 at § 8).

On September 8, 2022, the parties executed an Extension Agreement extending the term through September 30, 2023, also drafted by G Squared's Chicago legal team and reaffirming Illinois governing law. (Fed. Compl. Ex. 2; Cook County Compl. ¶¶ 27-36). Cassandra performed by introducing Gorillas and Choco—both German companies—to G Squared, leveraging Christian Edler's European network. (Cook County Compl. ¶¶ 37-43). Based on these introductions, G Squared invested substantial capital in both companies during 2021 and 2022, committing over $20 million to each. (Cook County Compl. ¶¶ 44-48). G Squared paid Cassandra's referral fees promptly by wire transfer to Cassandra's German bank account. (Cook County Compl. ¶¶ 49-52). In December 2022, Getir Perakende Lojistik A.S. (a Turkish company) acquired Gorillas. (Fed. Compl. ¶ 16; Cook County Compl. ¶¶ 53-58). G Squared subsequently committed approximately

$95,000,000 to Getir in September 2023, with all decisions made by Chicago management. (Fed. Compl. ¶ 17; Cook County Compl. ¶¶ 65-71).

On October 1, 2025, G Squared filed the instant federal declaratory judgment action seeking only a declaration that Cassandra is not entitled to any fee. (Fed. Compl. at p. 6). G Squared never served this Complaint. On October 7, 2025—six days later—Cassandra filed a comprehensive breach of contract action in Cook County seeking $950,000 plus interest, attorneys' fees, and costs, and served it the next day. (Cook County Compl. ¶¶ 136-140), (Affidavit of Service of Cook County Complaint attached as Exhibit "B").

## III.  ARGUMENT

### A.  THIS COURT LACKS PERSONAL JURISDICTION OVER CASSANDRA UNDER RULE 12(B)(2)

### 1.  Legal Standard

When a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of demonstrating that jurisdiction is proper. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Because Illinois's long-arm statute extends jurisdiction to the full extent permitted by the Due Process Clause, the inquiry is constitutional. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The defendant must have "purposefully availed itself of the privilege of conducting business in [Illinois], thus invoking the benefits and protections of its laws," and the plaintiff's claims must "arise out of or relate to" the defendant's forum-directed contacts. *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015).

The "purposeful availment" requirement ensures that a defendant is not subject to jurisdiction "solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The defendant's conduct must demonstrate that it "deliberately reached out beyond" its home jurisdiction to target

the forum state. *Walden v. Fiore*, 571 U.S. 277, 285 (2014). Critically, "the plaintiff cannot be the only link between the defendant and the forum." *Id.*

### 2. Cassandra Has Not Purposefully Availed Itself of Illinois

Cassandra is a German entity with its principal place of business in Berlin, Germany. (Fed. Compl. ¶ 6; Cook County Compl. ¶ 4). Cassandra has no office, employees, agents, or physical presence in Illinois or anywhere in the United States. All of Cassandra's substantive activities—sourcing European investment opportunities, cultivating relationships with German startup founders, and introducing German companies to G Squared—occurred in Europe, not Illinois.

The complaint alleges only that: (1) Cassandra entered into a contract with G Squared; (2) the contract contains an Illinois choice-of-law clause; (3) Cassandra received payments by wire transfer from G Squared's Illinois bank; (4) Cassandra communicated with G Squared via email and telephone; and (5) Cassandra sent invoices to G Squared's Illinois office. (Fed. Compl. ¶¶ 8, 12-21; Cook County Compl. ¶¶ 16-52). This is insufficient.

In *Sungard Data Systems, Inc. v. Central Parking Corp.*, 214 F. Supp. 2d 879 (N.D. Ill. 2002), this district confronted facts materially indistinguishable from those alleged here. The plaintiff alleged that the defendant had entered into a contract containing an Illinois choice-of-law clause, made telephone calls to Illinois, and sent payments to Illinois. *Id.* at 884-85. The court held that these contacts were "insufficient bases for jurisdiction" and dismissed for lack of personal jurisdiction. *Id.* at 885. The court reasoned that "simply making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction" because such activities do not demonstrate that the defendant "purposefully directed its activities at Illinois." *Id.* The court emphasized that the defendant's lack of any physical presence, offices, or performance of substantive contract obligations in Illinois was fatal to the plaintiff's jurisdictional showing. *Id.*

*Sungard* is directly controlling. Like Central Parking, Cassandra had no Illinois presence, performed no substantive work in Illinois, and engaged in only routine contractual communications with an Illinois party. Cassandra's receipt of wire transfers from G Squared's Illinois bank reflects the unilateral activity of the Illinois plaintiff, not Cassandra's deliberate effort to target Illinois. In *Wilson v. LIEBEL HOLDINGS III, LLC*, No. 09 C 7424, 2010 U.S. Dist. LEXIS 10950, at *8-10 (N.D. Ill. Feb. 9, 2010), the court rejected jurisdiction based on "email negotiations, payment from Illinois, [and] Illinois choice-of-law" provisions, holding that these contacts do not satisfy purposeful availment because they are "the ordinary incidents of a contractual relationship." *Id.* at *9.

In *Richardson RFPD, Inc. v. Nexus Technologies, Inc.*, No. 1:20-cv-02754, 2021 U.S. Dist. LEXIS 178111, at *10-12 (N.D. Ill. Sept. 20, 2021), the court dismissed for lack of personal jurisdiction where the defendant's Illinois contacts were "limited to contract negotiation by phone/email and administrative payments to the forum state," holding these were "insufficient bases for jurisdiction." *Id.* at *11. The court explained that "the mere fact that the defendant negotiated a contract with an Illinois resident and sent payments to Illinois pursuant to that contract does not, without more, establish the minimum contacts necessary for personal jurisdiction." *Id.* at *12. The court emphasized that contract negotiation and payment are "passive" contacts that do not reflect the defendant's deliberate effort to target the forum, contrasting such passive contacts with "active" contacts such as maintaining offices in Illinois, traveling to Illinois for in-person meetings, or performing substantive work in Illinois—none of which are alleged here. *Id.*

The Seventh Circuit's decision in *Philos Technologies* provides the controlling framework and compels dismissal. In *Philos*, a Korean company had executed a licensing agreement with an Illinois plaintiff, sent multiple payments to Illinois, engaged in extensive email and telephone

communications with Illinois about contract performance, and participated in negotiations involving Illinois-based parties. 802 F.3d at 908-09. Despite these contacts, the Seventh Circuit held that personal jurisdiction was lacking because "the overall deal and performance were centered abroad" and the Korean company's activities "did not target Illinois specifically or involve substantial performance in Illinois." *Id.* at 914-15. The *Philos* court emphasized that "a contract alone, even one negotiated via communications to and from Illinois, does not establish purposeful availment" and that "the defendant's own contacts—not those of the plaintiff or third parties— must establish the jurisdictional nexus." *Id.* at 913-14. The critical inquiry is whether the defendant's activities were "Illinois-focused" or merely incidental to a contractual relationship with an Illinois party. *Id.* at 914. The court held that routine contractual communications and payments to Illinois are insufficient where "the defendant's business operations and the substantive performance of the contract occurred entirely outside Illinois." *Id.* at 915.

Cassandra's Illinois contacts are even more attenuated than those in *Philos*. The Korean company in *Philos* had engaged in negotiations involving meetings with Illinois-based parties. *Id.* at 908-09. Here, the only meeting about the referral fee dispute occurred in Berlin—Larry Aschebrook traveled to Germany in October 2023. (Cook County Compl. ¶ 74). This demonstrates that Cassandra did not "reach out" to Illinois; rather, G Squared's managing partner came to Cassandra. All of Cassandra's substantive work—sourcing and introducing European investment opportunities—occurred in Europe. The two Target companies were both German startups. (Fed. Compl. Ex. 1 at Ex. A; Cook County Compl. ¶¶ 20, 43). Cassandra's introduction of these companies required no Illinois presence; Cassandra's entire value derived from its European expertise and network, not from Illinois-based activities.

Under *Philos*, the dispositive question is whether Cassandra's activities were "Illinois-focused" or merely incidental to a contractual relationship with an Illinois party. 802 F.3d at 914. The answer is clear: all of Cassandra's deliberate, focused conduct occurred in Europe. Cassandra identified German investment opportunities, cultivated relationships with German founders, and introduced German companies to G Squared—all from Berlin. The fact that G Squared happened to be located in Chicago does not transform Cassandra's Europe-centered activities into Illinois-focused conduct. As the Supreme Court explained in *Walden*, "the plaintiff cannot be the only link between the defendant and the forum"—the defendant's own actions must create a substantial connection to the forum. 571 U.S. at 285. Here, G Squared is the only link.

### 3. Contrasting Cases Confirm That Cassandra Lacks Required "Plus Factors"

The cases upholding jurisdiction involve "plus factors" conspicuously absent here. In *Elorac, Inc. v. Sanofi-Aventis Canada Inc.*, No. 1:14-cv-01859, 2014 U.S. Dist. LEXIS 134301, at *15-18 (N.D. Ill. Sept. 24, 2014), the court sustained jurisdiction where the Canadian defendant had engaged in "sustained in-person negotiation" in Illinois, made "frequent trips to Illinois" over several years, and performed "long-term Illinois performance" of contract obligations including providing technical support and training to Illinois-based employees. *Id.* at *16-17. Similarly, in *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 716 (7th Cir. 2002), the court upheld jurisdiction where the defendant had "initiated the Illinois relationship," traveled to Illinois for in-person meetings, and engaged in "substantial contract performance in Illinois."

Cassandra's Illinois contacts consist entirely of: (1) a contract that G Squared drafted from Chicago; (2) routine emails and phone calls; (3) invoices sent to G Squared's Illinois office; (4) payments received by wire to Cassandra's German bank; and (5) a choice-of-law clause (not a forum-selection clause) that G Squared inserted. Under the consistent and unanimous holdings of

this district and the Seventh Circuit, these contacts are "too attenuated to establish personal jurisdiction." *Perfect Brow Art*, 2018 U.S. Dist. LEXIS 195632, at *9. None reflects Cassandra's deliberate decision to "reach out beyond" Germany to target Illinois. They are instead the incidental byproducts of a contractual relationship with an Illinois-based plaintiff—precisely the type of "unilateral activity" that *Burger King* held insufficient for personal jurisdiction. 471 U.S. at 475. This Court therefore lacks personal jurisdiction over Cassandra, and the Complaint must be dismissed under Rule 12(b)(2).

## B. THIS COURT SHOULD DECLINE TO EXERCISE JURISDICTION UNDER WILTON/BRILLHART

### 1. The Declaratory Judgment Act Confers Discretion to Abstain

Even if this Court had personal jurisdiction (which it does not), it should decline to exercise jurisdiction under the *Wilton/Brillhart* abstention doctrine. The Declaratory Judgment Act provides that a court "*may* declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a) (emphasis added). This grants federal courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton*, 515 U.S. at 286. The Supreme Court held that "in the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. The Court emphasized that district courts possess broad discretion to dismiss or stay declaratory judgment actions when parallel state proceedings will resolve the same issues, recognizing that declaratory relief is "an alternative, not an exclusive, remedy." *Brillhart*, 316 U.S. at 494-95.

The Seventh Circuit instructs courts to consider whether federal adjudication would serve a useful purpose or would merely result in duplicative litigation, weighing comity, judicial efficiency, potential forum shopping, and the adequacy of the alternative forum. *Envision*

*Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 987-89 (7th Cir. 2010). The threshold question is whether the federal complaint contains any "independent" non-declaratory claims. *R.R. Street & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 715-17 (7th Cir. 2009).

### 2. G Squared's Complaint Is Purely Declaratory and the Actions Are Parallel

G Squared's federal complaint requests only declaratory relief—a declaration that Cassandra is not entitled to any Transaction Fee. (Fed. Compl. ¶¶ 22-27, Claim for Relief at p. 6). There is no prayer for damages, injunction, rescission, or any other coercive relief. Because G Squared's complaint is purely declaratory, *Wilton/Brillhart* applies. *R.R. Street*, 569 F.3d at 717.

The federal and state actions are indisputably parallel. Both suits turn on the single question of whether the Referral Fee Agreement entitles Cassandra to a fee on G Squared's Getir investment, and both are governed exclusively by Illinois contract law. (Fed. Compl. ¶¶ 23-27; Cook County Compl. ¶¶ 112-140). The state complaint pleads breach of contract and seeks the fee plus interest; the federal complaint asks the court to declare the fee unowed. Resolution of the contract claim in state court will necessarily dispose of the declaratory question. District courts facing materially identical overlaps have treated the actions as parallel and abstained. *Mouw v. Shelter Mut. Ins. Co.*, No. 1:22-cv-02306, 2023 WL 226805, at *3 (N.D. Ill. Jan. 12, 2023) (staying first-filed federal declaratory action, emphasizing that "Wilton-Brillhart abstention does not turn on the sequence of suits filed in different fora, but rather their symmetry"); *AGL Servs. Co. v. Ecofurn LLC*, No. 1:23-cv-04263, 2024 WL 3766099, at *7 (N.D. Ill. Aug. 12, 2024) (dismissing declaratory action as the "classic' prospect for Wilton-Brillhart abstention").

### 3. All Wilton/Brillhart Factors Favor Abstention

The Cook County court will decide the contract's meaning and, if Cassandra prevails, enter a money judgment. A federal declaration would add nothing. As this district explained in *Ironshore*

*Indem., Inc. v. Synergy Law Grp., LLC*, No. 1:12-cv-00800, 2013 WL 693266, at *3 (N.D. Ill. Feb. 25, 2013), "allowing the declaratory judgment action before this Court to proceed further will not serve a useful purpose in clarifying the legal obligations and relationships among the parties. Rather, it will result in litigation that is duplicative of proceedings already taking place in state court." The state case will fully resolve the dispute—G Squared will have every opportunity to argue that no fee is owed. Either way, the parties' rights will be definitively established. A federal declaration is surplusage.

Allowing both cases to proceed risks inconsistent interpretations and wastes judicial resources—precisely the "piecemeal" concern *Wilton/Brillhart* seeks to avert. In *Ryan Int'l Airlines, Inc. v. East Trust-Sub2*, No. 3:10-cv-50135, 2011 WL 976742, at *3 (N.D. Ill. Mar. 14, 2011), the court abstained where the federal declaratory action "presents just one narrow legal issue..., but it is just a piece of the [state] litigation and Wilton/Brillhart abstention is designed to prevent piecemeal, duplicative litigation." The court emphasized that "judicial resources would be wasted were this court to decide the narrow issue of law that the [state] court must ultimately decide... when dealing with matters of purely state law, the state court is the better forum." G Squared's federal filing epitomizes piecemeal litigation—rather than defend Cassandra's comprehensive breach of contract claim in the forum whose law governs the dispute, G Squared asks this Court to issue an anticipatory ruling on a single contract interpretation question. Only Illinois contract law is in play; no federal question exists. The parties contractually selected Illinois law to govern. (Fed. Compl. Ex. 1 at § 8; Ex. 2 at § 6). Illinois courts routinely adjudicate fee-dispute contracts between sophisticated commercial entities, and abstention respects the state's interest in governing such agreements. Federal courts should be "reluctant to interfere" with state

court proceedings, especially when "the federal claim is solely declaratory" and "the underlying issues involve only state law." *Brillhart*, 316 U.S. at 495.

G Squared will likely argue that it filed first and therefore deserves priority. This argument fails. *Wilton* expressly permits abstention even when the federal case predates the state action, emphasizing that *Brillhart* "establish[ed] no mandatory rule requiring the first-filed complaint to take priority." 515 U.S. at 283 & n.1. District courts repeatedly stress that abstention "does not turn on the sequence of suits filed in different fora, but rather their symmetry." *AGL Servs.*, 2024 WL 3766099, at *7; *Ryan Int'l Airlines*, 2011 WL 976742, at *3. Moreover, G Squared never served its federal complaint. G Squared sat on its unserved complaint for six days while Cassandra prepared and filed a comprehensive breach of contract action—then served it immediately. As Judge Kendall observed in *Mouw*, allowing a plaintiff to "park" an unserved federal declaratory action to claim priority would "encourage[] a race to the courthouse" and undermine *Wilton/Brillhart*'s purposes. 2023 WL 226805, at *3.

Cassandra's state complaint seeks damages and encompasses every defense G Squared raised. Comparable—and fuller—relief is available in Cook County. The state court can adjudicate all contract interpretation issues, determine whether a fee is owed, award damages if appropriate, and grant complete relief. Moreover, all operative conduct occurred in Illinois or Germany, with G Squared's Chicago legal team drafting the Agreement, Chicago management making all payment decisions, and the breach occurring in Cook County when Chicago management refused payment. (Cook County Compl. ¶¶ 17, 49, 66, 108). Every consideration—parties, issues, governing law, operative conduct, and judicial efficiency—points to Cook County as the proper forum. The Cook County Court will fully resolve the dispute and provide complete relief. Federal adjudication would serve no useful purpose beyond allowing G Squared to forum shop. This Court

should decline jurisdiction and dismiss the complaint without prejudice, or in the alternative, stay the action pending resolution of the state case.

## C. ALTERNATIVELY, THE COMPLAINT MUST BE DISMISSED UNDER RULE 12(B)(6)

Even if this Court had personal jurisdiction and chose to exercise it (neither of which should occur), the Complaint fails to state a claim and must be dismissed under Rule 12(b)(6). Illinois courts consistently hold that declaratory relief "is not the function of the statute" when the plaintiff merely seeks a pronouncement about historical events. In *Baker v. Daniel S. Berger, Ltd.*, 710 N.E.2d 1038, 1043 (1st Dist. 2001), the court found a non-compete controversy "moot" because the covenant had lapsed before suit was filed, holding that plaintiffs "seek an impermissible declaration of rights as to past acts" and that such "back-looking" use of declaratory judgment is improper.

The same principle defeats G Squared's claim. The Getir transaction closed in September 2023—over two years ago. (Fed. Compl. ¶ 17; Cook County Compl. ¶ 65). Nothing suggests continuing performance obligations or future uncertainty. The question is purely retrospective: Is G Squared liable for a fee on a transaction that closed more than two years ago? A declaration today would not govern prospective conduct but would simply brand Cassandra's past demand unenforceable. This is precisely what *Baker* prohibits. The Declaratory Judgment Act is designed to resolve uncertainties about future rights and obligations, not to provide ex post facto absolution for completed transactions.

G Squared seeks declarations that "Cassandra is not entitled to any Transaction Fee related to G Squared's investment in Getir" (Fed. Compl. at p. 6(a))—an investment that closed in September 2023—and that "Cassandra is not entitled to any Transaction Fee related to G Squared's investment in any entity other than those defined as Targets" (Fed. Compl. at p. 6(b))—again

referencing past investments. There is no ongoing conduct to govern, no future transactions to clarify, and no continuing contractual relationship to guide. The Extension Agreement expired on September 30, 2023. (Fed. Compl. Ex. 2; Cook County Compl. ¶ 30). The parties negotiated a new Finder's Fee Agreement in 2025 for an entirely separate transaction. (Cook County Compl. ¶ 100). The Referral Fee Agreement is a dead letter, and G Squared seeks only a declaration about whether it must pay for a historical investment. This is a "back-looking" use of declaratory judgment that Illinois law prohibits. *Baker*, 710 N.E.2d at 1043.

G Squared's complaint also fails to establish an "actual controversy." The complaint concedes that Cassandra had not sued G Squared (as of the October 1, 2025 filing date), that the Agreement covers only Gorillas and Choco as defined Targets (Fed. Compl. ¶ 12; Ex. 1 at Ex. A), and that G Squared's Getir investment closed in September 2023 (Fed. Compl. ¶ 17). G Squared's theory is that Cassandra might sue and that the court should preemptively declare Cassandra's claim invalid. But Cassandra's demand for payment does not create a justiciable controversy sufficient to support declaratory relief when no lawsuit had been filed and G Squared could simply refuse to pay and wait to be sued. *Lihosit v. State Farm Mut. Auto. Ins. Co.*, 609 N.E.2d 917, 920 (1ˢᵗ Dist. 1993); *Shipp v. County of Kankakee*, 802 N.E.2d 284, 289 (3ʳᵈ Dist. 2003).

The Supreme Court has cautioned that Article III does not permit jurisdiction over a request to "declare the rights of parties on a state of facts which has not arisen and which may never arise." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Of course, the controversy is no longer hypothetical—Cassandra filed suit on October 7, 2025. But that filing renders G Squared's federal action even more inappropriate. Now there is a live, justiciable controversy in state court seeking coercive relief. The proper course is for G Squared to defend that action, not to seek a preemptive federal declaration.

Federal courts may decline to entertain a declaratory claim that replicates an available substantive cause of action. *Cohn v. Guaranteed Rate Inc.*, 130 F. Supp. 3d 1198, 1203 (N.D. Ill. 2015) (dismissing declaratory count that "serve[d] no useful purpose" because the same issue would be resolved by the contract claim). Here, the dispute turns exclusively on contract interpretation—whether the defined term "Target" encompasses Getir. (Fed. Compl. ¶¶ 24-25; Cook County Compl. ¶¶ 112-119). That question is the essence of the breach-of-contract action Cassandra has now filed. (Cook County Compl. ¶¶ 120-140). Because resolution of Cassandra's contract claim in state court will necessarily decide the issue G Squared asks this Court to pre-adjudicate, the declaratory count is redundant and should be dismissed. This principle applies with particular force where G Squared is attempting to reverse the ordinary procedural posture by filing a declaratory action instead of waiting to defend Cassandra's breach of contract claim—a transparent attempt to control the forum and timing of litigation that *Brillhart* discourages. 316 U.S. at 495.

### D. THIS ACTION MUST BE DISMISSED UNDER RULE 12(B)(5) FOR INSUFFICIENT SERVICE OF PROCESS

Cassandra Capital GmbH is a German limited liability company with its principal place of business in Berlin, Germany. (Fed. Compl. ¶ 6; Cook County Compl. ¶ 4). Because Cassandra is located in Germany, a Hague Service Convention signatory, service must comply with the Convention's mandatory requirements. *Volkswagenwerk AG v. Schlunk*, 486 U.S. 694, 705 (1988). Germany requires use of its Central Authority for service and has objected to alternative methods under Article 10, including service by mail or electronic means. *Luxottica Grp. S.p.A. v. The P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 1:18-cv-02188, 2019 U.S. Dist. LEXIS 56743, at *6-7 (N.D. Ill. Apr. 3, 2019). To effect valid service, the plaintiff must submit a German translation of the complaint and summons, pay the required fee, and transmit the

14

documents to Germany's Central Authority. *Immunex Corp. v. Sandoz Inc.,* No. 2:16-cv-01118 (D.N.J. July 23, 2021); *Lyman Steel Corp. v. Ferrostaal Metals Corp.*, 747 F. Supp. 389, 392 (N.D. Ohio 1990)

The complaint was filed on October 1, 2025. No certificate of service, status report, or motion for alternative service appears on the docket. Nothing in G Squared's filings indicates that German translations were prepared, fees paid, or papers transmitted to Germany's Central Authority. G Squared has made no attempt to begin the process of Convention-compliant service. This failure underscores the lack of diligence that characterizes G Squared's entire approach to this litigation—from filing an unserved declaratory action to sitting on that complaint while Cassandra prepared and filed its state court action. Because proper service is a prerequisite to personal jurisdiction, Cassandra preserves all Rule 12(b)(2) objections while challenging service sufficiency under Rule 12(b)(5). *Schinker v. Ruud Manufacturing Company*, 386 F. Supp. 626 (N.D. Ill. 1974) The Court should dismiss this action under Rule 12(b)(5) or, alternatively, quash any purported service and require G Squared to complete Hague-compliant service within a specified timeframe. *Rhodes v. J.P. Sauer & Sohn, Inc.*, 98 F. Supp. 2d 746, 752 (W.D. La. 2000); *Bestway Inflatables & Material Corp. v. The Individuals*, No. 1:24-cv-11696, 2024 U.S. Dist. LEXIS 88171, at *5-6 (N.D. Ill. May 14, 2024).

WHEREFORE, Defendant prays for an order dismissing Plaintiff's Complaint in its entirety with prejudice and awarding such other and further relief as the Court deems just.

Dated October 9, 2025          Respectfully submitted,

**CASSANDRA CAPITAL GMBH**
Defendant

By:

/s/ *Alexander Loftus*
One of Its Attorneys

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on October 9, 2025 I caused a true and correct copy of the foregoing DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT to be served upon counsel of record via email:

Matthew Kennison
Michael R. Dover
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, IL 60606
MKennison@kelleydrye.com
MDover@KelleyDrye.com

Jordan D. Weiss
Emily S. Unger
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
JWeiss@goodwinlaw.com
EUnger@goodwinlaw.com

                       /s/*Alexander Loftus*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| G SQUARED EQUITY, MANAGEMENT LP | ) ) ) | |
| Plaintiff, | ) | Case No: 1:25-cv-12036 |
| v. | ) ) | |
| CASSANDRA CAPITAL GMBH, | ) ) | |
| Defendant. | ) | |

# EXHIBIT "A"

FILED
10/7/2025 11:58 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L012473
Calendar, U
34779542

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

CASSANDRA CAPITAL GMBH, )
a German limited liability company, )
)
Plaintiff, )
)
v. ) Case No. **2025L012473**
)
G SQUARED EQUITY MANAGEMENT LP, )
a Delaware limited partnership, )
)
Defendant. )

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

## VERIFIED COMPLAINT

Plaintiff, Cassandra Capital GmbH ("Cassandra" or "Plaintiff"), by and through its undersigned counsel, LOFTUS & EISENBERG, LTD., and for its Complaint against Defendant G Squared Equity Management LP ("G Squared" or "Defendant"), states as follows:

### I.    NATURE OF THE ACTION

1.    This case involves a calculated breach of contract by a sophisticated Chicago-based venture capital firm that exploited a trusted business partner after reaping the benefits of his introductions and expertise. For over two years, Plaintiff Cassandra Capital—led by Christian O. Edler, a respected European venture capital investor and Harvard Business School alumni—faithfully performed under a written Referral Fee Agreement (Contracts attached hereto as Exhibit "A" and incorporated herein), introducing Defendant to highly valuable investment opportunities including Gorillas Technologies GmbH, a unicorn startup that would later be acquired by Getir. Defendant paid Plaintiff promptly and courteously for the initial transactions, building trust and extending the agreement for an additional year. But when Plaintiff's introduction of Gorillas led to Defendant's single largest transaction under the agreement—a $95 million investment in Getir in September 2023—Defendant's Managing Partner Larry Aschebrook initially acknowledged the

1

$950,000 referral fee was owed, even proposing a $5 million alternative payment, only to later withdraw that proposal and flatly refuse payment with the terse message: "Not happening. Pls do not email me again."

2.      This breach is particularly egregious because Defendant took advantage of the close working relationship it had cultivated with Plaintiff over four years. Defendant's executives praised Plaintiff's "hard work and support" and his helpfulness in "ongoing monitoring" of investments, encouraging continued collaboration while negotiating new finder agreements as recently as July 2025—all while refusing to honor a clear contractual obligation for a fee that had been due since October 2023. Defendant used its position as a well-capitalized institutional investor, operating from its Chicago headquarters with sophisticated legal counsel, to simply walk away from a contractual commitment to an individual entrepreneur operating from Berlin, apparently calculating that the cost and uncertainty of litigation would deter enforcement.

3.      Plaintiff brings this action to vindicate a clear contractual right under an agreement drafted by Defendant's own Chicago-based legal team, governed by Illinois law, and extended by mutual agreement precisely to cover the Getir investment. Plaintiff seeks only what he earned through years of cultivating relationships, making valuable introductions, and supporting Defendant's portfolio companies: $950,000 in contractually owed referral fees, plus prejudgment interest, post-judgment interest, and attorneys' fee

## II.     PARTIES

4.      Plaintiff, Cassandra Capital GmbH, is a limited liability company organized under German law, with its principal place of business in Berlin, Germany.

5.      Christian O. Edler is the Director of Cassandra Capital GmbH and acts on its behalf in all matters related to this dispute.

6.      Christian O. Edler is a distinguished venture capital investor with over a decade of experience in early-stage ventures, operating as a Sequoia Scout and Harvard Business School alumni, with a portfolio of over 60 angel investments generating 10x returns including multiple unicorns.

7.      Christian O. Edler has been recognized by WIRED Magazine as one of "Europe's hottest Startup Investors" and has secured exclusive deal flow by co-investing with premier firms such as Sequoia Capital and Andreessen Horowitz.

8.      Christian O. Edler's value extends beyond introductions to include ongoing monitoring, strategic guidance, and relationship management with portfolio companies, making him a particularly valuable referral partner.

9.      Defendant, G Squared Equity Management LP, is a Delaware limited partnership with its principal place of business at 875 North Michigan Avenue, Chicago, Illinois 60611.

10.     Larry Aschebrook is the Managing Partner of G Squared and operates from Defendant's Chicago headquarters, serving as the primary point of contact for all matters related to the Referral Agreement.

## III.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 735 ILCS 5/2-101, as this action seeks damages exceeding $50,000.00.

12.     This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209(a)(1) and (a)(7) because: (a) Defendant maintains its principal place of business in Chicago and transacts business here; (b) this action arises directly from Defendant's business activities conducted from its Chicago headquarters; (c) both agreements were executed by Defendant in Chicago through Larry Aschebrook; (d) all invoices were sent to and processed at Defendant's

Chicago office; (e) all payment decisions were made by Chicago-based personnel; (f) the breach occurred in Illinois when Chicago-based management refused payment.

13.    Venue is proper in Cook County pursuant to 735 ILCS 5/2-101 because Defendant's principal place of business is in Cook County and the breach occurred when Defendant's Chicago-based management refused payment.

14.    The parties expressly selected Illinois law to govern their relationship, as stated in Section 11 of the Referral Fee Agreement and Section 6 of the Extension Agreement, which provides: "This Extension will be governed and construed in accordance with the laws of the State of Illinois, United States of America, to the exclusion of both its principles and rules on conflicts of laws."

15.    Cook County is the most convenient forum because: (a) Defendant's principal place of business and all decision-makers are in Cook County; (b) key witnesses Larry Aschebrook and Jeffrey Barton, are located in Chicago; (c) all business records are maintained at Defendant's Chicago headquarters; (d) both agreements were executed through Defendant's Chicago office; (e) Illinois law governs.

## IV.    FACTUAL BACKGROUND

### A.  The Referral Fee Agreement

16.    On September 23, 2021, Plaintiff and Defendant entered into a written Referral Fee Agreement (Exhibit "A") pursuant to which Plaintiff agreed to introduce investment opportunities in exchange for referral fees on investments made by Defendant.

17.    The Agreement was drafted by Defendant's Chicago-based legal team, approved by Chicago-based management, and executed by Larry Aschebrook from Defendant's Chicago office.

18.     The Agreement recited that Plaintiff "has certain contacts who may be potential portfolio companies and/or investment targets" of interest to Defendant, accurately reflecting Christian O. Edler's extensive network built through years of successful investing with premier venture capital firms.

19.     Under the Agreement, Plaintiff served as an independent contractor with authority to make introductions of potential investment targets ("Targets").

20.     Exhibit A identified the initial Targets as: (1) Gorillas Technologies GmbH, and (2) Choco Communications GmbH—both high-growth European technology companies where Christian O. Edler had unique access and relationships with founding teams.

21.     Section 3, titled "Transaction Fees," provided:

> If Referrer introduces Manager to a Target and Manager and/or the Funds consummate a transaction with such Target during the term of this Agreement or within six (6) months after the date of this Agreement… the Manager will pay… a transaction fee… as set forth in Exhibit B attached hereto: Two percent (2.0%) of the committed capital amount to a Target up to $20 million; and One percent (1.0%) of the committed capital amount to a Target above $20 million.

22.     This tiered fee structure is consistent with industry standards for venture capital referral fees.

23.     Section 4 provided for survival of fee obligations:

> This Agreement shall terminate automatically at the end of the Term… Notwithstanding termination of this Agreement, the obligation of Manager to pay transaction fees to Referrer shall survive the termination of this Agreement with respect to any Target introduced by Referrer prior to such termination if Manager and/or the Funds consummate a transaction with such Target within twelve (12) months after the date of such termination.

24.     This 12-month survival provision protected Plaintiff's right to earn fees on deals in the pipeline, recognizing that venture capital investments have lengthy closing periods.

25.     The Agreement was non-exclusive and the initial term was six months, expiring March 23, 2022.

26.     Section 11 provided that the Agreement "shall be governed by the laws of the State of Illinois."

**B.  The Extension Agreement**

27.     By early 2022, both parties were satisfied with their relationship and chose to extend the Agreement.

28.     On September 8, 2022, the parties executed an Extension Agreement extending the term through September 30, 2023.

29.     The Extension Agreement was drafted by Defendant's Chicago-based legal team, negotiated and approved by Chicago personnel including Larry Aschebrook and Jeffrey Barton, and executed by Larry Aschebrook from Chicago.

30.     Section 2 stated: "Parties hereby agree to extend the Term of the Referral Agreement until September 30, 2023 (the 'Extended Term')."

31.     Section 8 provided: "As amended by this Extension, all of the terms and conditions of the Referral Agreement shall remain unchanged and in full force and effect."

32.     On September 8, 2022, Jeffrey Barton, Chief Legal Officer operating from Chicago, emailed Christian Edler confirming: "That is correct – there are no changes to the underlying agreement. This extension agreement merely extends the term… to September 30, 2023."

33.     Christian Edler responded that he was "fine to sign" given nothing else would change.

34.     Section 3 added an early termination provision allowing either party to terminate upon 10 business days' written notice. No such notice was ever provided.

6

35. Section 4 emphasized: "Manager and Referrer have not waived, and do not intend to waive, any of their respective rights or remedies under the Referral Agreement."

36. Section 6 reaffirmed Illinois governing law.

**C. Plaintiff's Performance**

37. Plaintiff performed by introducing valuable opportunities, providing ongoing support, and maintaining confidentiality.

38. On August 24, 2021, Christian Edler shared confidential Gorillas metrics with G Squared principal Spencer McLeod: "FYI – first month with declining operating cash burn while revenue growing."

39. Spencer McLeod responded: "Let's do more together" and later "You know everyone :)" acknowledging Plaintiff's network.

40. On September 22, 2021, Richard Harris thanked Christian Edler: "My pleasure. Thank you for all of your hard work and support. Looking forward to the future."

41. Larry Aschebrook acknowledged internally that Christian Edler had "been very helpful in ongoing monitoring" of referred deals.

42. On September 3, 2021, when a co-investor improperly marketed the Gorillas deal, Christian Edler intervened to protect Defendant's interests. Richard Harris responded appreciatively.

43. Daniel Khachab, Founder & CEO of Choco, stated: "Christian is an Angel how you would wish them to be: Super fast, thinks big and supports you in all situations."

**D. Defendant's Investments in Gorillas and Choco—Fee Payments**

44. Based on Plaintiff's introductions, Defendant invested substantial capital in both Gorillas and Choco during late 2021 and early 2022, triggering fee obligations.

7

45.     By October 2021, Gorillas had raised approximately €860 million ($1 billion) at a €2.6 billion ($3.1 billion) valuation. G Squared participated significantly, committing over $20 million.

46.     In a September 2, 2022, internal email, Larry Aschebrook asked Jeffrey Barton: "On Gorillas and Choco… [it] should just be 1% on new capital at this point, correct?"

47.     Jeffrey Barton confirmed: "Correct – on Gorillas and Choco, he is entitled to 1% for anything over $20M."

48.     This demonstrates that: (a) Defendant had invested over $20 million in each company by September 2022; (b) Plaintiff earned the 2% fee on the first $20 million; (c) additional investments triggered the 1% tier; (d) Defendant's Chicago-based counsel and managing partner understood and accepted these obligations.

49.     Plaintiff invoiced Defendant for these fees, and Defendant paid promptly without dispute, with all payment decisions made by Chicago management and processed from Chicago.

50.     An invoice dated February 4, 2023, detailed fees for "Gorillas Bridge" and "Choco" totaling €233,806.49 (exactly 1% of €23,380,649.33 invested).

51.     On November 18, 2021, Christian Edler texted Larry Aschebrook: "Hey Larry, can you take care of the invoice? :) Much appreciated!" Larry responded: "Am told it's being paid today/tomorrow."  The next day, Edler confirmed: "Well received – thank you very much."

52.     This payment history demonstrates the parties' course of dealing and Defendant's acceptance of the fee structure.

### E. The Gorillas-Getir Merger: Background

53.     Gorillas and Getir were direct competitors in the ultrafast grocery delivery market.

54.     According to Grocery Dive (December 12, 2022), ultrafast delivery companies "rode a wave of investment early in the pandemic but has struggled to grow in the U.S." with multiple firms exiting by late 2022.

55.     Business Insider (July 29, 2022) reported Gorillas was "looking for new money, but has to accept a downround" and had "laid off 300 office workers" and "pulled out of several markets"

56.     Gorillas was "reportedly reviewing new financing options as well as a sale" and "had worked with M&A experts from J.P. Morgan"

57.     According to Grocery Dive (December 12, 2022), "Ultrafast grocery delivery company Getir has acquired rival firm Gorillas."

58.     The deal "values Gorillas at $1.2 billion and values the combined companies at around $10 billion, according to a Financial Times report."

### F. Defendant's Involvement in the Getir Transaction

59.     As a Gorillas shareholder, Defendant was directly involved in the Getir acquisition and gained the opportunity to invest additional capital, with all decisions made by Chicago-based management.

60.     On October 6, 2022, Larry Aschebrook, operating from Chicago, emailed co-investors DST and Verlinvest regarding a "term sheet from Getir."

61.     An attachment titled "Getir TS Complete… 61022 executed" was circulated, indicating a signed term sheet.

62.     Larry Aschebrook forwarded the term sheet to G Squared's Chicago-based legal counsel, seeking analysis of "what the economics to G2 would be in this scenario."

63.     Larry inquired about "points… not related to the new money/old money dynamics," indicating negotiations about fresh capital investment versus equity conversion.

64.     All of Defendant's analysis, evaluation, and decision-making regarding Getir was conducted by personnel at Chicago headquarters.

**G. Defendant's $95 Million Investment in Getir**

65.     Following months of evaluation by Chicago-based management, Defendant committed approximately $95,000,000 to Getir in or around September 2023 as part of the acquisition financing.

66.     The decision was made by Chicago-based management, with all investment committee meetings, approvals, and authorizations conducted in or from Defendant's Chicago office.

67.     The Getir investment closed during the Extended Term, which ran through September 30, 2023, and, in any event, within the twelve-month survival period provided in Section 4 of the Referral Agreement.

68.     At the time of the investment, the Agreement was in full force and effect, and no termination notice had been given.

69.     Defendant's opportunity to invest in Getir was a direct result of Plaintiff's introduction of Gorillas.

70.     The causal chain is unbroken: Plaintiff introduced Gorillas → Defendant invested in Gorillas → Defendant's shareholder position provided access to participate in Getir's acquisition financing → Defendant committed $95 million.

10

71.     But for Plaintiff's introduction of Gorillas, Defendant would not have been positioned to make the Getir investment.

## H. Defendant's Acknowledgment of Fee Obligation and Subsequent Bad Faith

72.     In September 2023, shortly after the Getir investment closed, Christian Edler contacted Larry Aschebrook to discuss the referral fee owed under the Agreement.

73.     During this initial communication, Larry Aschebrook became angry and defensive, prompting Christian Edler to suggest they meet in person when Larry was next in Berlin to discuss the matter calmly.

74.     On October 16, 2023, Christian Edler and Larry Aschebrook met at the Sheraton Berlin Grand Hotel Esplanade to discuss the outstanding referral fee.

75.     At this meeting, Larry Aschebrook apologized for getting angry with Christian Edler.

76.     Larry Aschebrook explicitly acknowledged that Christian Edler was correct about the Agreement and that the referral fee was owed.

77.     Larry Aschebrook stated that his lawyers had confirmed the validity of Plaintiff's claim.

78.     Larry Aschebrook expressed surprise that the Agreement was still in effect, stating that he "didn't expect/know that there was still a contract in place," despite the fact that the Extension Agreement he had signed clearly extended the term through September 30, 2023.

79.     Christian Edler stated that in his view, it was "pretty clear" that Larry owed him approximately one million dollars (referring to the $950,000 fee plus potential interest or rounding) based on text messages with an executive with the company who received the investment.

11

80. Larry Aschebrook did not dispute this amount or the validity of the claim during the meeting.

81. Rather than contest the obligation or propose immediate payment, Larry Aschebrook proposed an alternative: that G Squared would make a $5 million Limited Partner commitment to Cassandra Capital's venture fund instead of paying the $950,000 cash referral fee.

82. This $5 million commitment over a 10-year fund life, with the standard 2% annual management fee, would generate approximately $1 million in management fees for Plaintiff over the life of the fund, effectively satisfying the referral fee obligation while also providing Plaintiff with additional capital to invest.

83. Christian Edler understood and accepted this proposal as an alternative method of satisfying Defendant's contractual obligation.

84. Larry Aschebrook further offered to assist Plaintiff with preparing his fund deck, to involve someone from G Squared's team in the fundraising process, and to introduce Christian Edler to G Squared's limited partners to help raise the fund.

85. These offers demonstrated Larry Aschebrook's recognition of the debt owed and his willingness to provide substantial assistance beyond the mere payment of the fee.

86. The day after the October 16, 2023, meeting, on October 17, 2023, Christian Edler sent Larry Aschebrook an email thanking him for the meeting and confirming the commitment.

87. Christian Edler's October 17, 2023, email stated: "Thanks so much for your time yesterday - I always enjoy talking with you and love you mentoring me. Thanks also for your 5m commitment to my fund. Really appreciate it!"

88. Larry Aschebrook received this email and did not respond to correct any misunderstanding or clarify that no binding commitment had been made.

89.     The $5 million LP commitment proposal demonstrates several critical facts: (a) Larry Aschebrook recognized that Defendant had a contractual obligation to compensate Plaintiff for the Getir transaction; (b) Larry Aschebrook did not dispute the causal connection between the Gorillas introduction and the Getir investment; (c) Larry Aschebrook's own lawyers had confirmed the validity of Plaintiff's claim; (d) Defendant had no legitimate contractual defense to payment; (e) Larry Aschebrook was willing to satisfy the obligation through an alternative structure that would benefit both parties.

90.     Following the October 16, 2023, meeting and the October 17, 2023, confirmation email, Larry Aschebrook repeatedly postponed the promised assistance with Plaintiff's fund.

91.     Larry Aschebrook failed to involve his team in helping with the fund deck, failed to make introductions to G Squared's limited partners, and continuously delayed taking any concrete steps to fulfill his commitment.

92.     In summer 2024—approximately nine months after the October 2023 meeting and commitment—Larry Aschebrook informed Christian Edler that he could no longer make the $5 million commitment to Plaintiff's fund.

93.     Larry Aschebrook had originally intended to fund the $5 million commitment from G Squared's growth fund but ultimately withdrew the proposal entirely.

94.     Defendant's withdrawal of the $5 million LP commitment proposal, after months of delay and unfulfilled promises of assistance, left Plaintiff with no compensation whatsoever despite: (a) Larry Aschebrook's explicit acknowledgment that the fee was owed; (b) Larry Aschebrook's admission that his lawyers confirmed the claim's validity; (c) Plaintiff's reasonable reliance on Larry's commitment; (d) nearly two years having passed since the fee became due in October 2023.

95. Defendant's conduct in acknowledging the debt, proposing an alternative payment, confirming that proposal via email, and then withdrawing it after months of delay demonstrates bad faith and a calculated effort to avoid a clear contractual obligation.

**I. Continued Business Relationship**

96. Despite the unresolved fee, Plaintiff continued cordial relations with Defendant throughout 2024 and into mid-2025.

97. On December 25, 2023, Christian Edler sent Larry a holiday greeting. On March 14, 2024, he sent a tip about a fintech opportunity but received no response.

98. On August 2, 2025, Christian Edler emailed Larry about purchasing a stake in Raisin DS GmbH and shared news about PsiQuantum's $1 billion fundraising.

99. Larry responded by inviting Christian to a Zoom meeting on August 11, 2025, demonstrating continued engagement nearly two years after the Getir investment.

100. In mid-2025, the parties were negotiating a new Finder's Fee Agreement for a Raisin DS transaction (draft dated July 31, 2025), showing Defendant remained willing to engage Plaintiff for new services while refusing to pay the outstanding Getir fee.

**J. Plaintiff's Formal Demand**

101. By September 2025, approximately two years after the Getir investment and nearly two years after Larry acknowledged the fee obligation, Plaintiff determined formal action was necessary.

102. On September 16, 2025, Christian Edler sent a comprehensive demand letter to Larry with subject line "Referral Fee – Gorillas/Getir Investment."

103.    The demand letter articulated: "the $95 million investment G Squared made into Getir in September 2023 was a direct consequence of your entry into Gorillas — an opportunity originally introduced and facilitated by Cassandra Capital GmbH."

104.    The letter recounted: "At the time, you confirmed that the referral fee claim was valid. We explored resolving this through a $5 million LP commitment into my fund, which was later withdrawn."

105.    The letter specified:

"Amount: $950,000 USD Basis: 1.0% of the $95M transaction Original Due Date: October 2023 (30 days post-closing) Governing Law: State of Illinois"

106.    The 1% rate applied because Defendant had already invested over $20 million in Gorillas, as confirmed by Jeffrey Barton's September 2, 2022 email. The letter requested payment by September 23, 2025 and stated: "I hope to wrap this up positively."

**K. Defendant's Refusal to Pay**

107.    On September 17, 2025, at 7:42 AM, Larry Aschebrook responded via email from Defendant's Chicago office. His entire response was:

"Not happening. Pls do not email me again. I've added my legal team here."

108.    The decision to refuse payment was made by Larry Aschebrook acting from Chicago headquarters, and the breach occurred in Cook County when Chicago-based management refused to honor the contractual obligation.

109.    The response constituted an unequivocal, unconditional refusal to pay.

110.    Significantly, the response did not: (a) contest any factual allegations; (b) dispute the $950,000 calculation; (c) argue Getir was outside the Agreement's scope; (d) claim the Extended Term had expired; (e) allege any breach by Plaintiff; (f) assert any contractual defense; (g) propose any alternative resolution.

15

111.    The absence of any substantive response suggests Defendant had no legitimate defense and simply chose not to pay after previously admitting the fee was due by offering a $5 million Limited Partner commitment to Cassandra Capital's venture fund instead of paying the $950,000 cash fee.

**L. The Agreement Covers the Getir Transaction**

112.    The Getir investment falls within the Agreement's scope for multiple reasons.

113.    First, the investment was a direct consequence of Plaintiff's introduction of Gorillas. The causal chain is unbroken and the Getir opportunity flowed directly from the Gorillas introduction.

114.    Second, the Getir investment constitutes a "transaction with" Gorillas within Section 3's meaning. When Getir acquired Gorillas, Defendant's investment represented a continuation of its investment relationship with the Gorillas business.

115.    Third, the investment occurred during the Extended Term and, in any event, within the 12-month survival period. Gorillas was introduced during the term, and the Getir investment closed in September 2023—before the September 30, 2023 expiration and well within any applicable survival window.

116.    Fourth, Defendant's conduct demonstrates it understood the Getir investment triggered a fee obligation. Larry's November 2023 acknowledgment that "the referral fee claim was valid" and his $5 million LP proposal evidence this understanding.

117.    Fifth, the course of dealing supports a broad interpretation. Defendant paid fees on multiple Gorillas investment tranches. Jeffrey Barton's September 2, 2022 confirmation that Plaintiff was "entitled to 1% for anything over $20M" demonstrates Defendant understood fees applied to all investments related to an introduced Target.

16

118.     Sixth, Illinois contract interpretation principles support Plaintiff's position. The parties' clear intent was that Plaintiff would be compensated for introducing valuable opportunities resulting in investments. The Getir investment was precisely such an opportunity.

119.     Seventh, the Extension Agreement preserved all of Plaintiff's rights. Section 4 states: "Manager and Referrer have not waived, and do not intend to waive, any of their respective rights or remedies under the Referral Agreement."

## V.     CLAIM

### COUNT I
### BREACH OF CONTRACT

120.     Plaintiff realleges paragraphs 1 through 119 as if fully restated herein as paragraph 120 of its Verified Complaint.

121.     The Referral Fee Agreement as extended constitutes a valid, enforceable contract under Illinois law, supported by adequate consideration and satisfying all requirements including offer, acceptance, mutual assent, and sufficiently definite terms.

122.     Plaintiff fully performed by introducing Gorillas and Choco, providing ongoing support, maintaining confidentiality, and complying with all obligations.

123.     Defendant accepted and benefited from Plaintiff's performance without objection.

124.     As a direct result of Plaintiff's introduction of Gorillas, Defendant invested in Gorillas and gained the opportunity to invest $95 million in Getir.

125.     The Getir investment occurred during the Extended Term and, in any event, within the twelve-month survival period provided in Section 4 of the Referral Agreement.

126.     At the time of the Getir investment, the Agreement was in full force and effect. Defendant did not exercise its right to terminate early.

127.　Under Section 3 and Exhibit B, Defendant owed Plaintiff a fee calculated as 2% up to $20 million and 1% above $20 million.

128.　Because Defendant had already invested over $20 million in Gorillas (as confirmed by Jeffrey Barton), the applicable rate for the $95 million Getir investment was 1%.

129.　One percent of $95,000,000 equals $950,000.

130.　Under industry custom, fees are due within 30 days of closing, making the fee due by approximately October 15, 2023.

131.　Defendant has failed and refused to pay the $950,000 fee.

132.　On September 17, 2025, Larry Aschebrook explicitly refused payment, stating "Not happening."

133.　Defendant's refusal constitutes material breach of the Agreement.

134.　Defendant has provided no valid legal or contractual basis for refusal and has not alleged any breach by Plaintiff or failure of performance.

135.　Larry Aschebrook's November 2023 acknowledgment that the referral fee was due and his $5 million LP proposal as payment constitute admissions of Defendant's obligation.

136.　As a direct result of Defendant's breach, Plaintiff has suffered damages of $950,000.

137.　Plaintiff is entitled to prejudgment interest from October 15, 2023 through judgment.

138.　Under 815 ILCS 205/2, the legal interest rate is 5% per annum absent written agreement to the contrary, and the Agreement specifies no different rate.

139.　Prejudgment interest from October 15, 2023, through October 15, 2025 (24 months) equals $95,000 ($950,000 × 0.05 × 2.0), continuing to accrue at $3,958.33 monthly.

18

140.    Plaintiff is entitled to post-judgment interest at 9% per annum pursuant to 735 ILCS 5/2-1303(a).

WHEREFORE, CASSANDRA CAPITAL GMBH respectfully requests that this Court enter judgment in its favor and against G SQUARED EQUITY MANAGEMENT LP in an amount to be determined at trial of this matter, plus interest, attorney's fees where applicable, and costs of bringing this action.

Respectfully submitted,
**CASSANDRA CAPITAL GMBH**
Plaintiff

By:

*Alexander Loftus*

One of Its Attorneys

Alexander N. Loftus, Esq.
LOFTUS & EISENBERG, LTD.
181 W. Madison, Suite 4700
Chicago, Illinois 60602
p: 312.899.6625
alex@loftusandeisenberg.com

Firm No: 64600

Dated:  October 7, 2025

19

## <u>VERIFICATION</u>

Under penalties as provided by law pursuant to Section 5/1-109 of the Illinois Code of Civil Procedure, the undersigned hereby certifies that the statements set forth in the **VERIFIED COMPLAINT** are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

/s/ Christian Edler (Oct 7, 2025 18:36:35 GMT+2)

**CASSANDRA CAPITAL GMBH**

20

# EXHIBIT "A"

DocuSign Envelope ID: 8541AB1C-82EA-426A-AA4E-841CCE971D6E

**REFERRAL FEE AGREEMENT**

**THIS REFERRAL FEE AGREEMENT** (this "Agreement") is entered into as of this __23rd_ day of September 2021, by and between G Squared Equity Management LP (together with its affiliates and private fund entities, "Manager"), a Delaware limited partnership with offices located at 205 N. Michigan Avenue, Suite 3770, Chicago, Illinois 60601, and Cassandra Capital GmbH ("Referrer"), a company with limited liability formed under the laws of Germany with offices located at Westfälische Strasse 82, 10709 Berlin, Germany , each individually a "Party" and collectively, the "Parties."

*RECITALS*

**WHEREAS,** Manager is the manager of certain venture capital and private equity funds (the "Funds").

**WHEREAS,** Referrer has certain contacts who may be potential portfolio companies and/or investment targets that may be of interest to Manager and the Funds (each individually, a "Target" and collectively, the "Targets"), as defined in Exhibit A hereto, which may be updated from time-to-time.

**WHEREAS,** Manager desires to authorize Referrer to introduce Manager and the Targets, in return for a Referrer's fee to be paid to Referrer as more specifically described hereunder.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto do agree as follows:

*AGREEMENT*

1. Role of Referrer. Referrer is authorized to introduce to Manager the Targets. Referrer is not authorized to act as an agent for Manager or the Funds, nor to bind or attempt to bind Manager or the Funds in any manner. Referrer is and shall be an independent contractor and not an employee, agent, representative, affiliate, partner or joint venturer of Manager or the Funds and Referrer shall not hold itself out as such and shall not make any assertion that could lead the Targets to believe that Referrer is an employee, agent, representative, affiliate, partner or joint venturer of Manager or the Funds. In no event shall Referrer perform any act in connection with this Agreement, which is in violation of any state or federal securities laws.

2. Compensation to Referrer.

(a) As its sole compensation for its services to be provided by Referrer hereunder, Referrer shall receive a Referrer's fee in accordance with the fee schedule set forth on Exhibit B hereto (the "Fee Schedule"). Referrer shall be responsible for its own overhead and out of pocket expenses incurred in connection with the services provided hereunder.

3. Time and Manner of Payment.

(a) Payment of Referrer's fees pursuant to Section 2(a) hereof shall be made by the Manager in accordance with the Fee Schedule.

DocuSign Envelope ID: 8541AB1C-82EA-426A-A44E-841CCF971D6E

(b)  Manager and the Funds shall have the right, in its sole discretion, not to enter into a transaction with a Target for any reason or no reason whatsoever, in which case no Referrer's fee shall be payable with respect to such Target.

4.  <u>Term of Agreement</u>.  This Agreement applies only to the Targets named herein this Agreement and Exhibit A hereof and shall remain in effect for a period of six (6) months from the date of this Agreement and will terminate automatically at the end of such term.  Notwithstanding such termination, the provisions of Sections 2 and 3 hereof regarding Referrer's fees shall survive and remain in full force and effect for a period of twelve (12) months following the date of this Agreement (except in the case of a termination by Manager as a result of a breach of this Agreement by Referrer) if prior to the termination of this Agreement the Target qualifies as an Introduced Target as described hereinabove

5.  <u>Confidentiality</u>.

(a)  As used in this Agreement, "Confidential Information" means all information concerning or related to Manager, the Funds and their respective investors, portfolio companies and affiliates, regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form, and shall specifically include all financial statements, budgets, business plans or forecasts of such parties; provided, that Confidential Information shall not include (A) information which is or becomes generally known to the public through no act or omission of Referrer and (B) information which has been or hereafter is lawfully obtained by Referrer from a source other than Manager so long as, in the case of information obtained from a third party, such third party is not subject to an obligation of confidentiality owed to Manager at the time such Confidential Information is disclosed.

(b)  Except as otherwise permitted by subsection (c) below, Referrer will not, without the prior written consent of Manager, disclose or use for its own benefit any Confidential Information.

(c)  Notwithstanding subsection (b) above, Referrer is permitted to (i) disclose Confidential Information to the extent specifically authorized by Manager in writing, and Referrer shall take all such action as is necessary or desirable in order to ensure that each of the persons or entities to whom disclosure is authorized maintains the confidentiality of any Confidential Information that is so disclosed, and (ii) disclose Confidential Information to the extent, but only to the extent, required by law.

(d)  Upon the termination of this Agreement for any reason, Referrer will return to Manager all Confidential Information which has previously been delivered to it (whether in paper form, electronic form or other format).

(e)  Referrer acknowledges and agrees that Manager and the Funds would be irreparably damaged in the event that any of the provisions of this Section are not performed by Referrer in accordance with their specific terms or are otherwise breached.  Accordingly, Referrer agrees that each of Manager and the Fund is entitled to an injunction or injunctions to prevent breaches of this Section and has the right to specifically enforce this Section and the terms and provisions hereof in addition to any other remedy available at law or in equity.

(f)  Manager and the Funds agree to keep confidential any confidential information provided by Referrer concerning the Targets, including the fact that it is contemplating a transaction with

DocuSign Envelope ID: 8541AB1C-82EA-426A-A44E-841CCE971D6F

Manager and/or the Funds. Notwithstanding the foregoing, Manager and the Funds shall be permitted to disclose confidential information of a Target (i) to the extent required by law and (ii) to their respective officers, directors, employees, affiliates, investors and advisors who need to know such information in connection with an evaluation of a potential investment in a Target (provided that Manager shall take all such action as is necessary or desirable in order to ensure that each of the persons or entities to whom disclosure is authorized maintains the confidentiality of any Confidential Information that is so disclosed). Upon written request, Manager will return to Referrer all confidential information of the Targets which has previously been delivered to it (whether in paper form, electronic form or other format).

6. <u>Representations of Referrer</u>. Referrer covenants, represents and warrants to Manager that Referrer is a foreign entity or foreign national domiciled outside of the U.S.; is not required to register in the U.S. as a broker-dealer; is not subject to "disqualification" with respect to membership with the Financial Industry Regulatory Authority, Inc. ("<u>FINRA</u>"), or association with Manager, as Referring Party is not subject to any "statutory disqualification" as defined in Section 3(a)(39) of Securities Exchange Act of 1934; and, that it has and will maintain all licenses, permits and other authorizations required by applicable laws, rules or regulations in order to perform the services hereunder. Referrer acknowledges and agrees that it shall conduct its activities a t a l l t i m e s in connection with its engagement hereunder in compliance with all applicable securities and other laws, rules and regulations. Referrer will indemnify, defend and hold Manager, the Funds and their respective officers, directors, investors and affiliates harmless from and against any losses, claims, damages, costs and expenses or other liabilities any such indemnified party incurs as a direct or indirect result of any breach by Referrer of the foregoing covenant, representation and warranty or any other breach by Referrer of its obligations hereunder. Referrer makes no representation that the information provided by the Targets will be materially complete and correct and will not contain any untrue statements of a fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. Manager recognizes and confirms that the Referrer (i) will be using and relying primarily on the information from the Targets and information available from generally recognized public sources in performing the services contemplated hereunder without having independently verified the same; (ii) does not assume responsibility for the accuracy or completeness of the information; and (iii) does not make an appraisal of any of the assets of the Targets.

7. <u>Exclusivity</u>. This Agreement is not exclusive as to either Party, and Referrer shall be free to perform similar services for other parties, and Manager and the Funds shall be free to engage others to introduce Manager and the Funds to potential targets.

8. <u>Miscellaneous</u>. This Agreement: (a) may be amended only by a writing signed by each of the Parties; (b) may not be assigned, pledged or otherwise transferred, whether by operation of law or otherwise, without the prior consent of the other Party; (c) may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument; (d) contains the entire agreement of the Parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (e) shall be governed by, and construed and enforced in accordance with, the laws of the State of Illinois; and (f) shall be binding upon, and inure to the benefit of, the Parties and their respective heirs, successors and permitted assigns. The waiver by a party of any breach or violation of any provision of this Agreement shall not operate or be construed a waiver of any subsequent breach or violation hereof. Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be

DocuSign Envelope ID: 8541AB1C-82EA-426A-AA4E-841CCE971D6E

ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

*[Remainder of Page Intentionally Left Blank –*
*Signature Page to Follow]*

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed on their respected behalves by their duly authorized representatives as of the date first above written.

**MANAGER**

G Squared Equity Management LP,
a Delaware limited partnership

By:    Larry Aschebrook
Its:    Authorized Representative

**REFERRER**

Cassandra Capital GmbH,
a German company with limited liability

By:    Christian Edler
Its:    Director

**EXHIBIT A**

<u>TARGETS</u>

1. Gorillas Technologies GmbH
2. Choco Communications GmbH

DocuSign Envelope ID: 8541AB1C-82EA-426A-AA4E-841CCF971D6F

**EXHIBIT B**

<u>FEE SCHEDULE</u>

If Referrer introduces Manager to a Target and Manager and/or the Funds consummate a transaction with such Target during the term of this Agreement or within six (6) months after the date of this Agreement (except in the event of a breach of this Agreement by Referrer, in which case no fee shall be due), at the time of the closing (the "<u>Closing</u>") of the transaction, the Manager will pay or cause to be paid to Referrer in immediately available funds, a transaction fee (the "<u>Transaction Fee</u>") as described below:

- Two percent (2.0%) of the committed capital amount to a Target up to $20 million; and
- One percent (1.0%) of the committed capital amount to a Target above $20 million.

DocuSign Envelope ID: 92149GD9-3E27-497A-A5B5-48622D3C9609

## EXTENSION AGREEMENT

This EXTENSION AGREEMENT TO REFERRAL FEE AGREEMENT (this "Extension") is entered into as of this 8th day of September 2022, by and between G Squared Equity Management LP (together with its affiliates and private fund entities, "Manager"), a Delaware limited partnership with offices located at 205 N. Michigan Avenue, Suite 3770, Chicago, Illinois 60601, and Cassandra Capital GmbH ("Referrer"), a company with limited liability formed under the laws of Germany with offices located at Westfälische Strasse 82, 10709 Berlin, Germany , each individually a "Party" and collectively, the "Parties."

### RECITALS:

**WHEREAS,** the Parties did enter into a Referral Fee Agreement effective as of September 23, 2021 (the "Referral Agreement"), pursuant to which Referrer did introduce certain parties to Manager;

**WHEREAS,** under the Referral Agreement, the initial Term was to have expired on March 23, 2022; and,

**WHEREAS,** the Parties desire to extend the Referral Agreement in order to further continue the relationship between the Parties pursuant to the terms set forth herein.

**NOW, THEREFORE**, in consideration of the premises and mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Incorporation of Recitals; Definitions.** The foregoing recitals are hereby incorporated into this Extension and made a part hereof. Capitalized terms used herein shall have the same meaning as set forth in the Referral Agreement, unless otherwise indicated herein.

2. **Term Extension.** In accordance with Section 4 of the Referral Agreement, the Parties hereby agree to extend the Term of the Referral Agreement until September 30, 2023 (the "Extended Term").

3. **Termination Rights.** Either Party shall have the right at any time, with or without cause, to terminate this Extension upon the provision of written notice of termination to the other Party, with such termination to be effective 10 business days after the date of delivery of such notice by the terminating Party to the other party. Early termination of this Extension will not entitle either Party to any refund of any payments made by a Party in connection with the Referral Agreement.

4. **No Waiver of Rights.** Manager and Referrer have not waived, and do not intend to waive, any of their respective rights or remedies under the Referral Agreement. By entering into this Extension, Manager and Referrer agree that neither Manager nor Referrer is waiving any of its rights or remedies under the Referral Agreement, at law or in equity, and that neither of them shall be prejudiced in any way as the result of entering into this Extension and agreeing to the Extended Term.

5. **Representations and Warranties.** Each of the Parties represents and warrants to the other Party that each of the undersigned has the authority to act on behalf of such Party, to execute and deliver this Extension on behalf of such Party, and to bind such Party to the terms and conditions of this Extension. None of the Parties has relied upon any representations or statements made by any other Party with respect to this Extension which are not specifically set forth in this Extension.

DocuSign Envelope ID: 92149GD9-3E27-497A-A5B5-48622D3C9609

6. **Governing Law.** This Extension will be governed and construed in accordance with the laws of the State of Illinois, United States of America, to the exclusion of both its principles and rules on conflicts of laws.

7. **Amendment and Waiver.** This Extension may be amended only by a written agreement signed by the Parties to be charged with any such amendment. The rights and remedies of the Parties are cumulative and not alternative. Neither the failure nor any delay in exercising any right, power or privilege under this Extension will operate as a waiver of such right, power or privilege, and no single or partial excuse of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or any other right, power or privilege.

8. **Effect of this Extension; Entire Agreement.** As amended by this Extension, all of the terms and conditions of the Referral Agreement shall remain unchanged and in full force and effect. The Parties acknowledge and agree that in the event of any conflict between the terms of this Extension and the terms of the Referral Agreement, the terms of this Extension shall govern. This Extension, together with the Referral Agreement, contains the entire agreement and understanding between the Parties respecting the subject matter hereof, and supersedes all prior and contemporaneous agreements, statements, understandings, terms, conditions, negotiations, representations and warranties, whether written or oral, made by and among the Parties concerning the matters covered by this Extension.

9. **No Presumption Against Drafter.** Each of the Parties has jointly participated in the negotiation and drafting of this Extension. In the event of an ambiguity or a question of intent arises, this Extension shall be construed as if drafted jointly by each of the Parties and no presumptions or burdens of proof shall arise favoring any Party by virtue of authorship of any of the provisions of this Extension.

10. **Counterparts; Electronic Transmission.** This Extension may be executed in one or more counterparts, none of which need contain the signatures of each of the Parties and each of which shall be deemed an original. The Parties may deliver executed signature pages to this Extension by electronic or e-mail transmission. No Party shall raise as a defense to the formation or enforceability of this Extension as a contract, and each Party forever waives any such defense, either (i) the use of electronic or e-mail transmission to deliver a signature or (ii) the fact that any signature was signed and subsequently transmitted via electronic or e-mail transmission.

*[Remainder of Page Intentionally Left Blank –*

*Signature Page to Follow]*

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed on their respected behalves by their duly authorized representatives as of the date first above written.

**MANAGER**

G Squared Equity Management LP

By:    Larry Aschebrook

Its:    Authorized Representative

**REFERRER**

Cassandra Capital GmbH

By:    Christian Edler

Its:    Director

# Complaint-rev 3

Final Audit Report                                                                                          2025-10-07

| | |
|---|---|
| Created: | 2025-10-07 |
| By: | Alexander Loftus (alex@loftusandeisenberg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAPxZz6nTIzgxxGLhRUrcHSjDNU2DPoa8T |

## "Complaint-rev 3" History

📄 Document created by Alexander Loftus (alex@loftusandeisenberg.com)
2025-10-07 - 2:20:00 PM GMT- IP address: 207.237.240.14

📧 Document emailed to Christian Edler (ce@cassandracapital.de) for signature
2025-10-07 - 2:20:05 PM GMT

📄 Email viewed by Christian Edler (ce@cassandracapital.de)
2025-10-07 - 3:35:16 PM GMT- IP address: 87.248.114.143

✒️ Document e-signed by Christian Edler (ce@cassandracapital.de)
Signature Date: 2025-10-07 - 4:36:35 PM GMT - Time Source: server- IP address: 176.0.5.240

✅ Agreement completed.
2025-10-07 - 4:36:35 PM GMT

Adobe Acrobat Sign

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

G SQUARED EQUITY,                            )
MANAGEMENT LP                                )
                                             )
        Plaintiff,                     )     Case No: 1:25-cv-12036
                                             )
        v.                             )
                                             )
CASSANDRA CAPITAL GMBH,                      )
                                             )
        Defendant.                     )

# EXHIBIT "B"

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**CASSANDRA CAPITAL GMBH, a German limited liability company,**

      *Plaintiff(s) / Petitioner(s)*

v.                                         Case No.: 2025L012473

**G SQUARED EQUITY MANAGEMENT LP, a Delaware limited partnership,**

      *Defendant(s) / Respondent(s)*

## AFFIDAVIT OF SERVICE

I, Jamie L. White, state:

I am over the age of 18 and not a party to this action. I am an authorized process server under the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004.

I served the following documents to G SQUARED EQUITY MANAGEMENT LP in Sangamon County, IL on October 8, 2025 at 3:48 pm at 801 ADLAI STEVENSON DRIVE, SPRINGFIELD, IL 62703-4261 by leaving the following documents with Baylon Elfgen who as Intake Specialist at ILLINOIS CORPORATION SERVICE COMPANY is authorized by appointment or by law to receive service of process for G SQUARED EQUITY MANAGEMENT LP.

Summons - Alias Summons
VERIFIED COMPLAINT, REFERRAL FEE AGREEMENT, EXTENSION AGREEMENT

White Male, est. age 18-24, glasses: Y, Red hair, 300 lbs to 320 lbs, 6' to 6' 3".
Geolocation of Serve: https://google.com/maps?q=39.7578133333,-89.6440283333
Photograph: See Exhibit 1

Total Cost: $150.00

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

/s/ *Jamie L. White*

Executed in

    Sangamon County          ,

    IL      on    10/8/2025    .

Signature
Jamie L. White
+1 (217) 801-3585
Proof Illinois LLC
No. 117.001863



Exhibit 1a)